[Cite as *State ex rel. Menz v. State Teachers Retirement Bd. of Ohio*, 2014-Ohio-2419.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Jason Menz, | : | |
| Relator, | : | |
| v. | : | No. 13AP-586 |
| The State Teachers Retirement Board of Ohio, | : | (REGULAR CALENDAR) |
| | : | |
| Respondent. | : | |
| | : | |

D E C I S I O N

Rendered on June 5, 2014

*Dietz Law Office, LLC*, and *James M. Dietz* for relator.

*Michael DeWine*, Attorney General, and *Lydia M. Arko,* for respondent.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, J.

{¶ 1} Relator, Jason Menz, has brought this original action seeking a writ of mandamus ordering respondent, State Teachers Retirement Board of Ohio ("STRB"), to vacate its decision denying his application for disability retirement benefits and to enter a decision granting his application.

{¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court who examined the evidence and issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommended this court deny the request for a writ of mandamus.

{¶ 3} Relator objects to the magistrate's findings of fact through the following objections:

> The Magistrate failed to include in her Findings of Fact, the fact that Dr. Berarducci stated that Relator was disabled as of his June 19, 2012 evaluation. In addition, the Magistrate failed to confirm that Dr. Berarducci, STRS' evaluator, stated that Relator has been 'assiduous' in following his doctors' instructions. Finally the Magistrate failed to include Dr. Berarducci's statement that Relator's medical condition has not, in part, improved because of the lack [of] available medical personnel in his area and as such his chances for 'successful headache pain control' are forever elusive. At pages 8-9, the Magistrate references Dr. Berarducci's June 19, 2012 evaluation report, but only quotes from a very limited portion of that Report. In fact, in that report Berarducci stated:

> ...Clearly, Mr. Menz likely will not be returning to work with headache at the levels he describes today. To that extent, he is "disabled", but declaration of permanent disability retirement would seem to close off potential for future improvement. In some patients, declaration of "total disability" only makes the situation worse from the standpoint of allowing for eventual improvement...

> Ultimately, all pain problems improve, if the right combination of physical and psychobehavioral measures can be found. Mr. Menz has been assiduous in following the recommendations given to him, but that state of successful control has remained elusive. I do think he is hindered by where he lives presently in that adequately aggressive and creative medical/psychiatric therapies are not available to him in his home environment. It [has] become less and less feasible for him to travel distances to meet specialists he needs. Nevertheless, I suspect that success in controlling his headache will come if he has a pain "mentor" available to him as he needs it, when he needs it, no matter how frequent that interaction may become. Failing this kind of personalized, daily, face-to-face interaction with the therapist seems to mean (and likely will continue to mean) that no effective solution in this case will evolve. As such, all of the various conditions as currently defined in this case may mean that the path leading to a successful outcome is too thin and insecure such that successful headache pain control remain forever elusive.

{¶ 4}   Because we find STRB abused its discretion in denying relator's disability benefits application, we grant relator's request for a writ of mandamus.

## I.  Summary of Facts and Board Proceedings

{¶ 5}   Relator worked as an elementary school principal with the Liberty Local School District and is a member of the State Teachers Retirement System ("STRS"). Relator suffers from severe and debilitating headaches which have greatly affected his ability to perform his customary job duties, causing him to frequently be absent from work.  During the 2010-2011 school year, relator was absent 132 days due to personal illness.  On March 10, 2011, Liberty Local Schools Board of Education declined to renew relator's administrative contract.

{¶ 6}   Beginning in August 2009, relator sought treatment at the University of Pittsburgh Headache Center under Dr. Robert J. Kaniecki.  Over the course of nearly two years, relator visited the center on multiple occasions but continued to suffer from severe headaches despite various treatments and medications.  Ultimately, Dr. Kaniecki concluded relator should be considered permanently disabled, as relator's "migraine condition is expected to last at least an additional several years, if not a decade or two." (Certified Record, at 23.)

{¶ 7}   Relator filed a disability benefit application on June 17, 2011, which attached a report from his attending physician, Dr. Kaniecki.  After receiving relator's disability application, STRS scheduled an independent medical evaluation by Dr. Albert Berarducci.  Dr. Berarducci examined relator on August 17, 2011 and submitted a report stating he believed relator was temporarily disabled and relator's headaches were "sufficiently disabling [and] [relator] likely will not tolerate an immediate return to his previous occupation."  (Certified Record, at 30.) Dr. Berarducci recommended relator seek additional treatment and recommended a number of pain clinics to relator.  STRS notified relator it would delay consideration of his application pending his seeking additional medical treatment as recommended by Dr. Berarducci.

{¶ 8}   Following Dr. Berarducci's initial examination and report, relator traveled to the Diamond Headache Center in Chicago for additional testing and headache treatment.  Despite treatment at the Diamond Headache Center, no resolution was found and relator continued to suffer from debilitating headaches.

{¶ 9}   On April 12, 2012, relator returned to his attending physician, Dr. Kaniecki, who submitted a report the following day.  Dr. Kaniecki recounted the extensive list of medications and treatments relator had in the previous two and one-half years in an attempt to alleviate his headaches.  Dr. Kaniecki stated, "[d]espite all these steps, [relator] continues to report an underlying daily headache with severe headache 17 days per month and incapacitating headache 5 days per month."  (Certified Record, at 36.)  Dr. Kaniecki concluded for the second time that relator should be determined permanently disabled, stating: "[i]t is my opinion, within a reasonable degree of medical certainty, that [relator] is disabled from his position of school principal.  It is also my medical opinion that he is disabled from his position as a schoolteacher."  (Certified Record, at 36.)

{¶ 10} On June 19, 2012, Dr. Berarducci again examined relator.  In his assessment of relator's condition, Dr. Berarducci noted relator had not worked in his chosen profession since the previous evaluation (August 17, 2011).  In the same evaluation, Dr. Berarducci stated, "[c]learly, [relator] likely will not be returning to work with [the] headache at the levels he describes today.  **To that extent, he is 'disabled,'** but declaration of permanent disability retirement would seem to close off potential for future improvement."  (Emphasis added.)  (Certified Record, at 58.)

{¶ 11} Dr. Berarducci noted in his assessment, "[relator] has been assiduous in following the recommendations given to him, but that state of successful control has remained elusive."  (Certified Record, at 58.)  Dr. Berarducci went on to conclude, "I see no immediate resolution of this problem based on the large volume of information that I have reviewed for this evaluation and for the evaluation dated August 17, 2011." (Certified Record, at 59.)

{¶ 12} The physicians of the Medical Review Board reviewed both the evidence and Dr. Berarducci's evaluations and concurred with Dr. Berarducci's opinion.  On August 14, 2012, the Medical Review Board recommended to STRB to deny relator's disability application.  STRB voted to deny relator's application on September 20, 2012.  Relator appealed STRB's denial and submitted additional medical evidence for review.

{¶ 13} Dr. Berarducci reviewed the additional documentation in January 2013 regarding relator's ongoing medical treatments.  In his assessment, Dr. Berarducci stated:

[Relator] clearly has shown that he has not **for at least the past 18 months and likely will not return to his previous position in teaching**, but I still maintain that this is for reasons lying outside my personal expertise in the specialty of Neurology. To me it is clear that Mr. Mertz is not 'neurologically disabled'. **It is obvious to me that he will not return to work in the next 12 months and to that extent he fits the legal definition of 'permanent' disability from teaching.**

(Bold emphasis added; underlining in original.) (Certified Record, at 113.)

## II.  Magistrate's Decision and Relator's Objections

{¶ 14} A writ of mandamus is the appropriate remedy to seek "relief from an adverse determination concerning disability retirement benefits or other retirement decisions." *See State ex rel. Pontillo v. Pub. Emps. Retirement Sys. Bd.*, 98 Ohio St.3d 500, 2003-Ohio-2120, ¶ 23; *State ex rel. Moss v. Ohio St. Hwy. Patrol Retirement Sys.*, 97 Ohio St.3d 198, 2002-Ohio-5806, ¶ 6; and *State ex rel. McMaster v. School Emps. Retirement Sys.*, 69 Ohio St.3d 130 (1994).  A relator must demonstrate: (1) he has a clear legal right to the relief prayed for; (2) STRB has a clear legal duty to provide the requested relief; and (3) relator has no plain and adequate remedy in the ordinary course of law. *State ex rel. Gill v. School Emps. Retirement Sys. of Ohio*, 121 Ohio St.3d 567, 2009-Ohio-1358, ¶ 18.

{¶ 15} A determination by STRB whether a person is "entitled to disability retirement benefits is reviewable in mandamus to correct an abuse of discretion." *State ex rel. Bruce v. State Teachers Retirement Bd. of Ohio*, 153 Ohio App.3d 589, 2003-Ohio-4181, ¶ 95 (10th Dist.), citing *State ex rel. Pipoly v. State Teachers Retirement Sys.*, 95 Ohio St.3d 327, 2002-Ohio-2219, ¶ 14.  "Abuse of discretion" means a decision that is unreasonable, arbitrary, or unconscionable. *Id.*

{¶ 16} The magistrate concluded STRB did not abuse its discretion when it relied on an independent medical opinion that relator was not incapacitated due to a neurological condition.  Specifically, the magistrate stated that the objective medical evidence presented does not support relator's argument that he is permanently disabled as defined under R.C. 3307.62(C).  Therefore, the magistrate recommended we deny relator's request for a writ of mandamus.

{¶ 17} With respect to the magistrate's findings of fact, relator argues Dr. Berarducci, in fact, found relator was disabled. Relator also objects to the magistrate's failure to include that relator had been "assiduous" in following his doctor's instructions, and that relator's medical condition had not improved, in part, due to a lack of medical personnel in his area. Relator also argues no statutory requirement exists requiring relator to present evidence of a neurological or physical cause for his headaches. Relator concludes that STRB abused its discretion when it denied relator's disability benefits and STRB is required to grant relator's application for disability retirement.

{¶ 18} Under R.C. 3307.62, a member of STRS is entitled to disability coverage when STRB accepts the member's application. In part, R.C. 3307.62(C) provides:

> Medical examination of the member shall be conducted * * * to determine whether the member is **mentally or physically incapacitated** for the performance of duty by a disabling condition, either permanent or presumed to be permanent for **twelve continuous months** following the filing of an application.

(Emphasis added.)

{¶ 19} Relator filed for STRB disability on June 17, 2011. Included with his application, relator attached a report of Dr. Kaniecki. In his report, Dr. Kaniecki stated relator had visited the center multiple times from August 2009 to May 2011. Dr. Kaniecki concluded relator was "permanently" disabled as relator's "debilitating medical condition" had lasted beyond one year, and Dr. Kaniecki expected the disability to last "at least an additional several years." (Certified Record, at 23.)

{¶ 20} As explained above, the record demonstrates Dr. Berarducci, consistent with the conclusions of each of the other physicians who treated relator, considered relator unable to return to employment as a teacher or principal. Indeed, Dr. Berarducci twice opined that relator has met the statutory definition of permanently disabled. Furthermore, Dr. Berarducci twice in the same medical evaluation admitted facts sufficient to render relator incapacitated to work; first by saying he had not worked in at least 18 months because of headaches, and again by stating he did not believe relator would be able to return to work within the next 12 months.

{¶ 21} The magistrate's recommendation relies, in part, on the Supreme Court of Ohio's holding in *State ex rel. VanCleave v. School Emps. Retirement Sys.*, 120 Ohio St.3d 261, 2008-Ohio-5377. In *VanCleave*, the court stated that "subjective complaints are not conclusive of disability, and objective medical evidence is still relevant to a determination of the severity of the condition." *Id.* at ¶ 47. However, the facts presented in *VanCleave* are distinguishable from those in the present case. In *VanCleave*, a disagreement existed between the disability applicant's treating physician and the independent medical examiner assigned by the School Employees Retirement System ("SERS"). The applicant's treating physician found the applicant was permanently disabled and unable to perform the duties of her job for at least 12 months. In contrast, SERS's medical examiner concluded the applicant "did not suffer from a disability that would preclude her [from] return[ing] to her last assigned duties." *Id.* at ¶ 44.

{¶ 22} Here, the examining physicians are in agreement that relator is prevented from working because of his debilitating headaches. Furthermore, each of the physicians has stated unequivocally that relator is unable to return to work within the next 12 months.

{¶ 23} Other cases that have addressed this situation are similarly distinguishable on their facts. STRB argues the Supreme Court of Ohio, in *State ex. rel. Morgan v. State Teachers Retirement Bd. of Ohio*, 121 Ohio St.3d 324, 2009-Ohio-591, affirmed *VanCleave*'s holding that a physician could consider a lack of objective medical evidence showing that one's physical limitations are caused by symptoms of the medical condition alleged when determining whether one was disabled or not. Again, the case is distinguishable. Specifically, the examining physician in *Morgan* opined, " 'I do not find anything on today's examination of an objective nature that would, in my opinion, preclude [Morgan] from [Morgan's] previous job.' " *Id.* at ¶ 8. The physician certified that Morgan was capable of resuming her regular duties. *Id.* at ¶ 9; *see also State ex rel. Riddell v. State Teachers Retirement Bd.*, 10th Dist. No. 13AP-660, 2014-Ohio-1646, ¶ 14 (where the court upheld the board's decision to terminate the relator's disability benefits where the independent medical examiner found that although the relator had been unable to perform her job duties, she was " 'not physically disabled from doing so' ").

{¶ 24} Here, unlike the above cases, Dr. Berarducci repeatedly stated, based on the symptoms presented, that relator was disabled and would not be able to return to his previous position within the next year. Therefore, pursuant to R.C. 3307.62(C), relator is a member who is "mentally or physically incapacitated for the performance of duty by a disabling condition, either permanent or presumed to be permanent for twelve continuous months" since the time he filed his disability retirement application.

{¶ 25} Because all the evidence in the record supports that relator has been unable to work in his previous position since October 2010 and will not be able to resume his duties for at least the next 12 months, we find STRB abused its discretion when it determined relator was not entitled to disability retirement benefits.

{¶ 26} Following an independent review of this matter, we sustain relator's objections and reject the magistrate's recommendation. Accordingly, we grant a writ of mandamus compelling respondent to vacate its denial of disability benefits to relator and compelling respondent to grant relator disability retirement benefits pursuant to R.C. 3307.62.

*Objections sustained; writ granted.*

KLATT and CONNOR, JJ., concur.

––––––––––

## APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Jason Menz, | : | |
| | : | |
| Relator, | : | No. 13AP-586 |
| | : | |
| v. | : | (REGULAR CALENDAR) |
| | : | |
| The State Teachers Retirement Board of Ohio, | : | |
| | : | |
| Respondent. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on January 24, 2014

*Dietz Law Office, LLC,* and *James M. Dietz,* for relator.

*Michael DeWine*, Attorney General, and *Allan K. Showalter,* for respondent.

IN MANDAMUS

{¶ 27} Relator, Jason Menz, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, State Teachers Retirement Board ("board"), to find that he is entitled to a disability retirement.

Findings of Fact:

{¶ 28} 1. Relator was employed as an elementary school principal with the Liberty Local School District in Cortland, Ohio, and is a member of the State Teachers Retirement System ("STRS").

{¶ 29} 2. During the 2010-2011 school year, relator was absent a total of 132 days due to personal illness.

{¶ 30} 3. On March 10, 2011, relator's administrative contract was not renewed by the Liberty Local Schools Board of Education.

{¶ 31} 4. Relator completed a disability benefit application and indicated that the nature of his physical/mental disability was:

> The nature of my disability is complications from debilitating migraine headaches. I experience an [average] of 20 headaches a month. The headaches rate to a severity of 9/10 more than half the time. I have been to the [emergency room] several times for my headaches. I have been under the care of the Director of, The Headache Center, University of Pittsburgh Medical Center since.

{¶ 32} 5. With his application, relator filed a report from Robert J. Kaniecki, M.D. In that May 6, 2011 report, Dr. Kaniecki provided the following history of relator's headaches:

> Jason Menz is a 38-year-old gentleman we initially saw on August 5, 2009, at our offices at the University of Pittsburgh Headache Center. At that time, he was a 36-year-old gentleman describing headaches dating back to the age of eight. He does recall headaches between ages 8 to 14, but between ages 14 and 24 his headache situation had improved noticeably. By age 24, the headaches had returned, and during his 30s, they have escalated significantly. For the 6 to 12 months prior to his initial visit, he was averaging 20 headache days per month with five being severe/incapacitating. He described unilateral or bilateral headaches, which would involve throbbing discomfort that worsened with activity, reaching a severity of 9/10. Nausea and vomiting were more problematic in the past, but he continued to experience sensitivities to light and noise. He would also experience a "hangover" of fatigue. At that time, we recommended amitriptyline for headache stabilization and Imitrex injections for attacks[.]
>
> Since the initial visit in August of 2009, we have had the opportunity to see Jason on multiple occasions. He was again seen in our offices on December 21, 2009, March 12, 2010, May 6, 2020 [sic], June 28, 2010, September 29, 2010, December 1, 2010, January 6, 2011, April 11, 2011, and

May 2, 2011. During this stretch of time, he has continued to experience approximately 20 headaches days per month with 10 being severe and 5 incapacitating. There have been occasional emergency department visits and frequent absences from work were necessary. Earlier this year, we started a period of medical leave to begin a more aggressive exercise and therapeutic program, but nevertheless, he has continued to experience a relatively high headache frequency. His headache impact test (HIT-6) scores, which indicate the level of disability associated with migraine, have remained in the "severe impact" range despite numerous medication adjustments. We recently instituted a Botox program to stabilize his headache disorder.

{¶ 33} Ultimately, Dr. Kaniecki opined that relator should be found to be permanently disabled, stating:

Jason approached me about the possibility of an occupation-specific disability and it has been brought to my attention that he is eligible for STRS disability retirement when suffering from a debilitating medical condition, which prevents patients from performing their most recent teaching positions. It is my opinion that Mr. Menz is presently unable to perform his job as an elementary school principal. His migraine condition is expected to last at least an additional several years, if not a decade or two, and given the refractory nature of his headaches over the past 18 months, it is my expectation that he will continue to suffer intermittent disability from protracted migraine episodes. Since the definition of "permanent" disability is listed as a condition extending beyond one year, I would certify him as permanently disabled.

{¶ 34} 6. After receiving relator's application, STRS scheduled relator for an independent medical evaluation with Albert L. Berarducci, Jr., M.D. In his August 17, 2011 report, Dr. Berarducci first discussed the state of the medical record which he was given to review, indicating that he had two copies of a letter from Dr. Kaniecki dated May 6, 2011 and noted further that the letter did not reveal the treatment strategy employed by Dr. Kaniecki. Dr. Berarducci noted there was a reference to relator having been seen by Dr. Mays at the Cleveland Clinic Foundation, Dr. Tamulonis, a neurologist in Youngstown, Ohio, and Dr. Maggiano, a local neurologist in the Cortland, Ohio area; however, Dr. Berarducci noted that there were no records from those neurologists

presented for him to review. Dr. Berarducci noted that relator presented four pages of personal statements prepared by himself, his wife, and his mother. Relator indicated that he began having headaches when he was six years old. The headaches went into remission for a time, but began again when he was married to his current wife in 2003, and accelerated in 2005 when his daughter was born.

{¶ 35} Thereafter, Dr. Berarducci indicated that the neurological portion of his examination was normal and recommended that relator attempt an alternative approach to headache management before disability was considered. Specifically, Dr. Berarducci indicated:

> ASSESSMENT: Mr. Menz has chronic daily headache that has been at the current level of severity (frequency/duration/intensity) for the last eight years, or since he married his current wife. There was an unquantified acceleration in his headache when his daughter was born. Though these two specific dates stand out not only to Mr. Menz, and also to his wife, they have gone unexplored as stressors and/or generators of headache in all prior headache evaluations over the last eight years in Pittsburgh, Cleveland, Youngstown, and local to his home in Cortland, Ohio. As I see it, this is one of the larger failings of the therapeutic plans employed by physicians treating Mr. Menz. That is, he has not effectively dealt into the psychobehavioral underpinnings of this headache syndrome, which I suspect are more significant than has been elucidated in the past. Though diagnosable psychopathology likely is not a significant contributor to the day to day "disability" he asserts is present, psychobehavioral fitness and endurance very likely contribute to pain intolerance, which leaves Mr. Menz to choose avoidance behaviors such as social withdraw from family affairs as a consequence of this headache. Paradoxically, he is able to exert himself physically in his exercise regimen even going so far as to say that physical exercise is a kind of "therapy" for him to get through a day in which he awakens fearing the worst with regard to headache impact on the day ahead. The incongruity of these poies [sic] of physical reaction to headache pain begs further definition. All of these elements need deeper and more flexible evaluation, if Mr. Menz is going to reach a self sustaining, more effective program of headache management at any time in the near future.

In body of this report I referred to the therapies employed by Mr. Menz as "passive." That is, his physicians have told Mr. Menz to do many things over the years as treatment for the headache. It seems Mr. Menz has dutifully followed all recommendations, but on a superficial level. He has never addressed deeper levels of headache awareness, progressing to a better understanding of how his particular physical and psycho-behavioral constitution permits the development of his headache problem and ultimate incapacity.

Taking an alternative, "mindfulness" approach to headache management will require specific instruction. That is, Mr. Menz needs to understand how it is that a particular environmental stressor triggers his headache—how his constitution promotes and predisposes him to maximum intensity headache so frequently—and what to do about it when such a headache is triggered. There is no headache syndrome that cannot be curtailed by one treatment measure or another. I have recommended to Mr. Menz that he consider a "second opinion" headache evaluation to gain just this type of perspective on his headache as distinguished from what it has been in the past or what it is destined to become on the present trajectory in the future. I gave him information about the Michigan Head-Pain & Neurological Institute (MHPNI) in Ann Arbor, Michigan to accomplish such a second opinion. He is free to go wherever he feels he is likely to get the best information and the Diamond Headache Clinic in Chicago, Illinois was brought up by Mr. & Mrs. Menz as well. No matter where he chooses to get further help with headache management, Mr. Menz needs to be more pro-active in the treatment of his own headache syndrome. A declaration of permanent disability retirement will likely be counterproductive in this case as it only frees him from the stresses and pressures of his job while not actually treating the underlying problem. This headache syndrome could flower again in the future when faced by different stressors meeting inadequate personal resistance, resulting in headache activity that recreates this same level of incapacity.

One additional physiologic feature that that Mr. Menz needs to address is the potential toxicity of Imitrex used exclusively by injection. He uses no other analgesic regimen aside from Imitrex. He and his wife estimate that he takes 3-4 injections of Imitrex weekly, roughly double the maximum allowable for an individual week. This has been a constant treatment

plan for many months, if not years. Imitrex toxicity may be contributing significantly to the overall headache profile reported today. An alternative treatment strategy promoting diminished use of Imitrex will test the "rebound headache hypothesis" to his ultimate overall benefit.

In short, Mr. Menz presents a significant headache problem as it is currently constituted. However, passive pain control strategies currently employed guarantee there will be no progressive evolution to a more effective personal plan to control this headache. He has had problem headaches since he was six years old and suffered a concussion (no relationship with the current headache, however). That accident should not have guaranteed a future of incapacitating headaches. Search for a more effective treatment strategy should begin now, before declaring Mr. Menz to be permanently disabled. There is reason for optimism, but only with a carefully revised approach to headache management, organized so that Mr. Menz orchestrates his behaviors and activities "mindfully" with the tacit acknowledgment that his life path and life choices can be either headache promoting or therapeutic in and of themselves.

From a purely neurological perspective, I do not think that Mr. Menz should be declared permanently disabled from teaching. His headache as currently described is sufficiently disabling that he likely will not tolerate an immediate return to his previous occupation without additional instruction in a different philosophy of headache pain management. I recommend that a temporary disability status be arranged for Mr. Menz so that he can go about finding a multidisciplinary, self-evolving treatment protocol for managing his headache. I have given him some recommendations and information regarding the Michigan Head-Pain & Neurological Institute. There are other similar chronic pain clinics throughout the United States (Diamond Headache Clinic, Scripps—La Jolla, Boston Pain Center, to name but a few) that emphasize a "mindful" approach to headache management dovetailed with a minimalist but effective medicinal regimen that is not overly toxic to the daily functioning the headache sufferer.

{¶ 36} 7. In a letter dated August 31, 2011, STRS notified relator that it was going to delay consideration of his application for six months so that he could secure additional medical treatment. Specifically, that letter provides:

> At this time the Medical Review Board concluded that your condition might improve within the 12 month period following receipt of your application.
>
> After reviewing the Independent Medical Examiner's report, the Medical Review Board determined that you must secure medical treatment for six months before further consideration of your application for disability benefits. The Retirement System cannot assume financial responsibility for such treatment. Following six months of treatment, you should request your doctor to furnish this office with a report including any test results completed during that period, regarding the treatment provided and progress you have made.
>
> Please inform us of the name and address of the physician you will be seeing for treatment.
>
> After receiving your doctor's report, we will arrange for reexamination.

{¶ 37} 8. Thereafter, relator traveled to Chicago, Illinois for an evaluation. Relator has attached copies from St. Joseph's Hospital; however, there are no reports that were generated from this visit. Instead, it appears that relator was given certain medications at the time he was discharged and certain instructions, including:

> MEDICATIONS AT THE TIME OF DISCHARGE:
> [One] Bystolic 5 mg daily.
> [Two] Toradol 10 mg 1 pill twice a day as needed for headache pain. Max of 20 pills per month.
> [Three] Norflex 100 mg 1 pill twice a day as needed for headache pain. Max of 20 pills per month.
> [Four] Migranal nasal spray 1 spray each nostril onset of the headache. Repeat in 15 minutes and again in 2h if needed. A max of 6 spays per day and 2 days per week.
> [Five] Pristiq 50 mg daily.
> [Six] Duxaril 75 mg 2 pills at bedtime.
>
> DISCHARGE INSTRUCTIONS:

The patient was given a follow-up appointment with Dr. Pinilla, Dr. Shiba, and biofeedback for April 5th. Diet: The patient was advised to follow a low tyramins free diet. Activities: Resume activities as tolerated.

{¶ 38} 9. Dr. Kaniecki submitted a report dated April 13, 2012, wherein he stated as follows:

This letter regards the medical condition of Jason Menz, a 39-year-old gentleman I most recently saw in our offices on April 12, 2012, for ongoing management of a chronic daily headache disorder. He initially presented to our attention in August of 2009, describing a long-standing history of episodic headache dating back to the age of eight but progression of headache to a near-daily basis since 2007 or 2008. Over the past 2 1/2 years, we have attempted to stabilize his headaches with a number of different medications, numbering approximately two dozen in terms of drugs aimed to either prevent or treat individual headache attacks. He has undergone extensive diagnostic testing, and most recently underwent re-evaluation through a second opinion at the Diamond Headache Center in Chicago. There he underwent a four-day hospital inpatient program as well as outpatient treatment medication changes. Despite all these steps, Jason continues to report an underlying daily headache with severe headache 17 days per month and incapacitating headache 5 days per month. He has shown no significant improvement despite a number of medication changes and trials of both occipital nerve blocks and Botox injections since August of 2011. Although we will continue to aggressively manage Jason, His [sic] lack of improvement despite all these measures results in a significant measure of disability.

It is my opinion, within a reasonable degree of medical certainty, that Mr. Menz is disabled from his position of school principal. It is also my medical opinion that he is disabled from his position as a schoolteacher. We are encouraging further employment opportunities that are more "flexible" and scheduling permitting absences and schedule adjustments when necessary. Please inform us if any further information is necessary.

{¶ 39} 10. Relator was again evaluated by Dr. Berarducci. In his June 19, 2012 report, Dr. Berarducci noted that the Chicago records he was provided were essentially a

discharge summary indicating the medications provided to relator and noted that, due to financial concerns, relator had not been able to reschedule an appointment with the clinic for follow-up care. Dr. Berarducci again noted that relator had not been aggressively pursuing a combination of anti-depressants and psychotropic medications to supplement his traditional psychological counseling noting that there was no neurological explanation for relator's unusually intractable headache syndrome. Dr. Berarducci noted that relator needed to deal with his insomnia and there needed to be more aggressive work in the psychiatric realm. He noted that relator had attempted stress reduction and relaxation exercises but noted that relator's purely personal attempts to control his headache pain, with no one but himself to advise and guide him, were not likely to be successful. Dr. Berarducci concluded as follows:

> I will leave to the committee the decision whether or not disability retirement should eventually be declared. This is not my bias all things considered, but I see no immediate resolution of this problem based on the large volume of information that I have reviewed for this evaluation and for the evaluation dated August 17, 2011. From a neurological perspective Mr. Menz has no measurable cause or reason to be permanently disabled. His inability to work resides only on his assertions he cannot work (hence the suspicions about malingering) or on purely psychobehavioral causes (depression, personality make-up, etc).
>
> PLAN: 1. More extensive sleep medicine evaluation to correct insomnia...
>      2. More aggressive, personalized psychiatric evaluation centered on exploration pain-allied treatments ...
>      3. Return to clinic PRN.

{¶ 40} 11. Thereafter, the physicians comprising the Medical Review Board reviewed the evidence and provided their recommendations. In his July 25, 2012 report, James N. Allen, M.D., recommended that disability retirement be denied, stating:

> In summary, this school principal has a long history of chronic headache dated to age 8. His headaches have become worse over the past decade to the point that he has stopped working as a principal but is currently working in another business. A brain MRI has shown a small pineal cyst but

these are very common (present in up to 10% of healthy people) and rarely cause symptoms when they are this small. His headache has not been easy to categorize into a specific type and he seems to best fit a chronic pain syndrome. As with many other patients with chronic pain syndromes, he has no abnormalities on physical exam or objective testing to explain his symptoms. Disability can often be counterproductive in the management of chronic pain in that a primary goal of treatment is to assimilate the patient back into a regular home and work environment with strategies to manage pain within the context of these environments. In this regard, disability can often create a barrier to optimal pain management. I recommend that disability retirement be denied.

{¶ 41} 12. In his July 25, 2012 report, Jeffrey C. Hutzler, M.D., also recommended that relator not be considered permanently incapacitated from the performance of his job duties, stating:

After reviewing these documents it is my recommendation that Jason Menz is not considered to be permanently or presumed to be permanently incapacitated for the performance of duty and that he should not be retired. Further psychiatric evaluation would be unlikely to shed more light upon the excellent evaluation performed by B[e]rarducci.

{¶ 42} 13. In his August 8, 2012 report Barry Friedman, M.D., opined that a psychiatric evaluation might prove beneficial, and stated:

Following review of the available records and the thorough evaluations performed by Dr. Berarducci in 2011 and 2012 I believe the applicant's best interests are served by further discussion of this case at a meeting of the Medical Review Board. Consideration should also be given to the benefit that might be obtained from a psychiatry disability evaluation prior to a final determination in this difficult case.

{¶ 43} 14. In a letter dated August 14, 2012, relator was notified that the board concluded he did not meet the criteria for permanent disability and that his case would be presented to the board in September.

{¶ 44} 15. In a letter dated September 21, 2012, relator was notified that the board denied his application for disability benefits and informed him of his right to appeal.

{¶ 45} 16. Relator appealed and his attorney submitted a letter reiterating that relator had done everything his doctors had asked him to do and, as recommended by Dr. Berarducci, had traveled to Chicago for treatment. Counsel asserted that one year had already passed since Dr. Berarducci first examined relator and relator was still not able to return to work because of his headaches. As such, counsel asserted that clearly relator was permanently disabled.

{¶ 46} 17. Relator also submitted additional medical evidence including the November 6, 2012 letter from William E. Beckett and an interpretive report of the Minnesota Multi Phasic Personality Inventory-2-Restructured Form ("MMPI-2-RF"), which recommended that relator be evaluated for somatoform disorder if the physical origin for his head pain complaints had been ruled out. Mr. Beckett's letter was written in response to Dr. Berarducci's reports. Mr. Beckett is very critical of Dr. Berarducci's reports and reiterates that relator continues to suffer headaches regardless of the steps he takes to find relief.

{¶ 47} 18. The additional medical evidence relator submitted was given to Dr. Berarducci for his review.

{¶ 48} 19. In a letter dated January 7, 2013, Dr. Berarducci noted that Mr. Beckett indicated he was submitting notes from a doctor for whom he had great respect, but there were no notes included with Mr. Beckett's letter. Further, Dr. Berarducci noted that there was no indication who had performed or interpreted the MMPI-2-RF, but discussed it, stating:

> MMPI-2-RF data suggest that Mr. Menz can be said to have 'Somatoform disorder, if physical origin for head pain complaints has been ruled out'—which in my view has. The MMPI-2-RF report bases this diagnosis on the 'Substantive Scale Interpretation...Somatic/Cognitive Dysfunction... The test taker reports experiencing head pain and is likely to present with multiple somatic complaints and be prone to developing physical symptoms in response to stress...['] (Emphasis mine).

Perhaps this is why Mr. Menz began experiencing his current headache in 2003 after marriage to his current wife and why this headache problem accelerated after the birth of his daughter in 2005. Perhaps this is also why his headache has seemed to be so infinitely malleable and inscrutable over the years evading good faith attempts to help him cope with 'stress' in its various forms and ultimately to avoid the resulting headache and psychobehavioral dysfunction. These and many other contradictory facets of the headache profile I have come to understand are expressed and analyzed more fully in the clinical notes of 8/17/2011 and 6/19/2012. Please refer to them for details, as I will not reiterate them for this report.

{¶ 49} Ultimately, Dr. Berarducci again concluded that relator was not disabled, stating:

In short, Mr. Menz does not have an objectively measurable neurological condition that invariably should result in the headache that 'disables' him. He clearly has shown that he has not for at least the past 18 months and likely will not return to his previous position in teaching, but I still maintain that this is for reasons lying outside my personal expertise in the specialty of Neurology. To me it is clear that Mr. Menz is **not 'neurologically disabled'**. It is obvious to me that he will not return to work in the next 12 months and to that extent he fits the legal definition of 'permanent' disability from teaching. As I have logically maintained and/or strongly implied in previous writings, Mr. Menz is unable to return to work because of a psychobehavioral condition that has now been defined as 'somatoform disorder'—a condition proved by the MMPI-2-RF on 10/4/12 data only made available to me in this recent submission of documents. After review of the new information I stand fully by my words and conclusions as previously expressed.

(Emphasis sic.)

{¶ 50} 20. Various physicians from the board again reviewed relator's application and the additional medical evidence he had submitted. Dr. Allen again recommended that disability retirement be denied, stating:

In summary, this school principal has a long history of chronic headache dating to age 8 and pre-dating his employment as an educator. There has been no physical

basis for his headaches despite an exhaustive diagnostic work-up. His headaches therefore best fit into a chronic pain syndrome. He has been able to resume employment in a non-education-related field. I do not question that he has headaches, however all forms of chronic pain syndromes without physical basis are rarely grounds for permanent disability. Also, somatoform disorders are rarely, if ever, a basis for permanent disability. Disability can often be counterproductive in the management of chronic pain in that a primary goal of treatment is to assimilate the patient back into a regular home and work environment with strategies to manage pain within the context of these environments. In this regard, disability can often create a barrier to optimal pain management and can prevent optimal treatment. I continue to recommend that disability retirement be denied.

{¶ 51} 21. Dr. Friedman recommended a psychiatric evaluation:

Given his long term very atypical course and the absence of a clearly defined organic neurologic diagnosis the potential for a somatoform disorder exists but at this point is only offered as an MMPI diagnosis. I do not believe that Mr. Menz can function on a daily basis as a school teacher and while I favor disability, a better understanding of his mental health may help establish his diagnosis and clarify his disability status. I believe the issues raised in his appeal may require further discussion, a psychiatric evaluation and/or personal appearance by the applicant prior to a final determination.

{¶ 52} 22. Dr. Hutzler again recommended that disability retirement be denied.

{¶ 53} 23. The board again voted to deny relator's request for disability retirement.

{¶ 54} 24. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 55} Relator asserts that a writ of mandamus is appropriate here where all the medical evidence confirms that he is mentally or physically incapacitated from the performance of his duty as an elementary school principal by a disabling condition that has existed for at least 12 months from the date of his application.

{¶ 56} Relator asserts that the only dispute in this case concerns his treatment, but not the fact that his headaches prevent him from performing his duties as a principal.

{¶ 57} It is this magistrate's decision that relator has not demonstrated that the board abused its discretion here.

{¶ 58} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 59} Mandamus is the appropriate remedy where there is no statutory right of appeal from a decision of a public retirement system. *State ex rel. Pipoly v. State Teachers Retirement Sys.,* 95 Ohio St.3d 327, 2002-Ohio-2219; *State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 82 Ohio St.3d 235 (1998); *State ex rel. Van Dyke v. Pub. Emp. Retirement Bd.*, 99 Ohio St.3d 430, 2003-Ohio-4123; *State ex rel. Schaengold v. Pub. Emp. Retirement Sys.*, 114 Ohio St.3d 147, 2007-Ohio-3760. As such, the determination by STRS and its retirement board of whether a person is entitled to disability retirement benefits is reviewable in mandamus because R.C. 3307.62 does not provide for an appeal from the administrative determination. *Id.* Determination of whether a member of STRS is entitled to disability retirement is fully within the discretion of the board. *See* R.C. 3307.62(F) and *Fair v. School Emps. Retirement Sys.*, 53 Ohio St.2d 118 (1978).

{¶ 60} In order to qualify for a disability retirement, a member of STRS must submit medical evidence establishing that they are mentally or physically incapacitated from the performance of duty by a disabling condition, either permanent or presumed to be permanent for 12 continuous months following the filing of an application. *See* R.C. 3307.62(C).

{¶ 61} In the present case, when he filed his application for disability retirement, relator indicated that the nature of his physical/mental disability was:

> The nature of my disability is complications from debilitating migraine headaches. I experience an [average] of 20 headaches a month. The headaches rate to a severity of 9/10 more than half the time. I have been to the [emergency room] several times for my headaches. I have been under the care of the Director of, The Headache Center, University of Pittsburgh Medical Center since.

{¶ 62} In support of his application, relator attached a report from Dr. Kaniecki, a neurologist. In response, STRS had relator examined by Dr. Berarducci, also a neurologist.

{¶ 63} In his August 17, 2011, June 19, 2012, and January 7, 2013 reports, Dr. Berarducci clearly opined that there was no physical neurological explanation for relator's headaches. In his August 17, 2011 report, Dr. Berarducci specifically noted that relator's treatment to date had been passive, i.e., relator has simply done what his physician's have told him to do. Dr. Berarducci noted that relator had never addressed the deeper levels of headache awareness nor had he progressed to a better understanding of how his particular physical and psychobehavioral constitution permit the development of his headaches and ultimate incapacity. As early as 2011, Dr. Berarducci inferred that simply taking medications was not going to resolve relator's headache issue. Dr. Berarducci specifically recommended that relator be granted a temporary disability so that he could pursue a multidisciplinary, self-evolving treatment protocol to manage his headaches.

{¶ 64} The board seemingly followed Dr. Berarducci's advice, giving relator six months to seek treatment. Relator did so; unfortunately, relator did not present much in the way of medical evidence explaining what treatments were attempted in Chicago. Relator was at the headache clinic for less than a week and it appears they tried different medications, some counseling, and biofeedback. Relator did not pursue anything thereafter. Needless to say, relator's condition did not improve.

{¶ 65} Dr. Berarducci examined relator again in June 2012. Dr. Berarducci again explained that the neurological examination was normal and that no physical cause had been identified to explain relator's unusually intractable headache syndrome. Dr. Berarducci again opined that if the right combination of psychobehavioral measures could be found, relator's headaches should resolve.

{¶ 66} Part of relator's argument is that he was disabled in August 2011 when Dr. Berarducci first examined him and he was still disabled in June 2012 when Dr. Berarducci examined him a second time. As such, relator asserts this demonstrates that he was actually permanently incapacitated for the performance of his duties for 12 months or longer. In other words, because his condition did not improve between August

2011 and June 2012, relator contends that the medical evidence clearly demonstrates that he is entitled to a disability retirement.

{¶ 67} As noted above, relator contends that he is permanently incapacitated due to the disabling condition of migraine headaches. However, Dr. Berarducci opined on three occasions that relator was not incapacitated from a neurological condition. In *State ex rel. VanCleave v. School Emps. Retirement Sys.,* 120 Ohio St.3d 261, 2008-Ohio-5377, the Supreme Court of Ohio stated:

> [S]ubjective complaints are not conclusive of disability, and objective medical evidence is still relevant to a determination of the severity of the condition.

*Id.* at ¶ 47.

{¶ 68} The objective medical evidence presented supports Dr. Berarducci's conclusion that relator is not disabled from a neurological condition.

{¶ 69} Furthermore, the fact that relator might be disabled due to a condition he does not allege causes his disability, namely somatoform pain disorder, STRS is not required to refer relator for a medical evaluation by someone in that field. In *State ex rel. Bruce v. State Teachers Retirement Bd. of Ohio*, 153 Ohio App.3d 589, 2003-Ohio-4181 (10th Dist.), the relator argued that STRS abused its discretion when it did not have Bruce evaluated by a psychiatrist when she had indicated on her disability application that chronic fatigue syndrome and fibromyalgia were causing her disability. Finding that Bruce had failed to present evidence that she was incapacitated by a psychological disorder, this court found that it was within STRS' discretion not to appoint a psychiatrist to examine her pursuant to R.C. 3307.62(C).

{¶ 70} The magistrate recognizes that relator was and is in a predicament. He is no longer working as a principal and he has two years from the date of his last service to apply for disability retirement. Relator has headaches and those headaches are debilitating. He has attempted certain treatments which have been completely unsuccessful. From a financial standpoint, the magistrate is certain that relator and his family are experiencing real difficulties. However, relator is still required to demonstrate the presence of a disabling condition. The magistrate does not dispute that relator has significant symptoms; however, Dr. Berarducci opined that relator had not

presented evidence of a neurological/physical cause for his headaches. As such, the majority of the treatment that relator has attempted has been unsuccessful. While there is evidence that relator has undergone some counseling, there are no medical records submitted detailing that therapy and/or treatment.

{¶ 71} Finding that the board did not abuse its discretion when it denied relator's application for disability retirement benefits, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
STEPHANIE BISCA BROOKS


NOTICE TO THE PARTIES
Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).